**No. 27-1008**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

JANSSEN BIOTECH, INC., JANSSEN SCIENCES IRELAND UC,

*Plaintiffs-Appellees*,

v.

ACCORD BIOPHARMA, INC., BIO-THERA SOLUTIONS, LTD.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court for the District of Delaware,
Civ. No. 26-222-GBW, Hon. Gregory B. Williams

---

## BRIEF OF AMICUS CURIAE ASSOCIATION FOR ACCESSIBLE MEDICINES IN SUPPORT OF DEFENDANTS-APPELLANTS

---

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421

*Counsel for Amicus Curiae*

November 13, 2026

## CERTIFICATE OF INTEREST

Undersigned counsel for Amicus Curiae certifies as follows:

1. **The full name of every entity represented by undersigned counsel is:**

   Association for Accessible Medicines

2. **The name of the real party in interest for the entities is:**

   N/A.

3. **All Parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities are:**

   N/A.

4. **The names of all law firms and the partners or associates that appeared for the entities in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance) are:**

   N/A.

5. **Other than the originating case(s) for this case, related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a) are:**

   None.

6. **Organizational victims and bankruptcy cases:**

   N/A.

Dated: November 13, 2026

/s/ *David Zimmer*
David Zimmer

## TABLE OF CONTENTS


INTEREST OF AMICUS CURIAE ........ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 5

I. The District Court's Application of the Nexus Requirement Conflicts with this Court's Precedent. ........ 6

A. The District Court's Nexus Analysis Is Irreconcilable with *Apple II*. ........ 6

B. This Court's Lost-Profits Precedent Confirms That a Reasonable Royalty, Not an Injunction, Is the Appropriate Remedy in a Case Like This. ........ 12

C. The Facts Here Demonstrate Why the District Court Legally Erred in Applying the Nexus Requirement. ........ 14

II. The District Court's Decision Creates Grave Threats to Biosimilar Innovation and Affordability. ........ 17

CONCLUSION ........ 20

CERTIFICATE OF COMPLIANCE ........ 22

CERTIFICATE OF SERVICE ........ 22

## TABLE OF AUTHORITIES

### Cases

*Apple Inc. v. Samsung Elecs. Co.*,
695 F.3d 1370 (Fed. Cir. 2012) (*Apple II*) ............ 2, 5, 6, 7, 8, 11, 12, 16, 19

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) ........................................................................7

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989)........................................................................... 8, 11

*Grain Processing Corp. v. American Maize-Products Co.*,
185 F.3d 1341 (Fed. Cir. 1999) ........................................................................12

*Janssen Products, L.P. v. Lupin Ltd.*,
109 F. Supp. 3d 650 (D.N.J. 2014)......................................................... 10, 11

*Johnson & Johnson v. Samsung Bioepis Co.*,
173 F.4th 454 (3d Cir. 2026) ........................................................................18

*Mylan Institutional LLC v. Aurobindo Pharma Ltd.*,
857 F.3d 858 (Fed. Cir. 2017) ........................................................................9

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
127 F.4th 896 (Fed. Cir. 2025) ................................................................. 9, 10

### Other Authorities

Rachel Goode & Bernard Chao, *Biological Patent Thickets and Delayed Access to Biosimilars, an American Problem*, J.L. & Biosciences, July-Dec. 2022, https://academic.oup.com/jlb/article/9/2/lsac022/6680093...................... 5, 18

Jeffrey Wu & Claire Wan-Chiung Cheng, *Into the Woods: A Biologic Patent Thicket Analysis*, 19 Chi.-Kent J. Intell. Prop. 93 (2020), https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?article=1263&context=ckjip. ........................................................................18

## INTEREST OF AMICUS CURIAE[1]

The Association for Accessible Medicines ("AAM") is a nonprofit, voluntary association representing manufacturers and distributors of generic and biosimilar medicines and bulk active pharmaceutical chemicals, as well as suppliers of other goods and services to the generic pharmaceutical industry. AAM's members provide patients with access to safe and effective generic and biosimilar medicines at affordable prices. AAM's core mission is to improve the lives of patients by providing timely access to safe, effective, and affordable prescription medicines. Generic drugs constitute more than 90% of all prescriptions dispensed in the United States, yet generics account for only 12% of total drug spending.

AAM regularly participates in litigation as an *amicus curiae*. AAM and its members have a significant interest in the questions presented in this appeal, which directly affect the ability of biosimilar manufacturers to bring FDA-approved biosimilar medicines to market and to provide patients with access to safe, effective, and lower-cost biologic medicines.

---

[1] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person or entity other than AAM or its counsel contributed money that was intended to fund the preparation or submission of this brief. All parties consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court's unprecedented decision holds that a biologic drug company can enjoin biosimilar competition just because one minor step in the biosimilar's manufacturing process infringes a patent held by the biologic drug company, even where the biosimilar could have made its product *without* infringing the patent and the biologic drug company does not even practice the patent. That decision, if allowed to stand, will gut the requirement that a patentee seeking an injunction prove that its asserted irreparable harm has a "nexus" to the act of infringement itself—not just to competition with a product that, in some minor way, happens to infringe. *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012) (*Apple II*). By undermining the nexus requirement, the decision will lead to the very harms to competition and consumer welfare that the nexus requirement is intended to prevent.

To obtain an injunction, a patentee must prove that irreparable harm "resulting from selling the accused product can be ascribed *to the infringement*," not merely to competition that the patentee could face even without the infringement. *Apple II*, 695 F.3d at 1375 (emphasis added). That nexus requirement prevents the patentee from "leverag[ing] its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Id.* Put simply, a patentee should not be able to bar competition from an infringing

product that could have competed just as effectively without the infringement. The patentee in that circumstance can remedy its harm through a reasonable royalty.

In this case, the biologic company (Janssen) accused an aspiring biosimilar competitor (Accord) of infringing its patent as part of its process for achieving interchangeability between the biosimilar and biologic drug. Notably, Janssen itself does not practice the patent in manufacturing its biologic drug product. The district court held that Janssen had satisfied the nexus requirement simply by showing that the infringement took place as part of the FDA-approved process for manufacturing an interchangeable biosimilar product. The court made no finding that Accord *needed* to infringe to achieve interchangeability or obtain FDA approval. The court also made no finding that the infringement added any value over alternative, non-infringing processes for manufacturing an interchangeable biosimilar product. According to the district court, *any* infringement that gets baked into the FDA-approved process for achieving interchangeability is enough to satisfy the nexus requirement and enjoin an aspiring biosimilar competitor, regardless of how minor and nonessential that infringement may be.

That holding is wrong and potentially devastating to the biosimilar industry. The court's decision conflicts with the requirements and purpose of the nexus requirement, as is clear from this Court's decision in *Apple II* and analogous decisions in the context of lost profits. And the facts of this case, which involve a

trivial act of infringement that had no impact on Accord's ability to manufacture its biosimilar product, powerfully demonstrate the district court's legal error.

If allowed to stand, the district court's decision would encourage biologic drug companies' practice of deterring biosimilar competition by asserting thickets of hundreds of patent claims against any aspiring biosimilar competitor. Manufacturing biologic and biosimilar products is enormously complex, and biologic drug companies have stockpiled patents directed to these manufacturing processes. Biosimilar companies can often design around these patents and do their best to do so. But under the district court's decision, if the biologic company can prove that the biosimilar infringed even one of the hundreds of patent claims the biologic company asserts, the biologic company can automatically enjoin biosimilar competition—even if the biologic company does not practice the patent, the infringement played a minor role in the biosimilar's manufacturing process, and the biosimilar easily could have designed around the patent. The result will be to incentivize biologic drug companies to obtain even more manufacturing process patents, including by buying broad patents from other companies simply to block biosimilar competition.

Those problems are exacerbated where, as here, the patent at issue is directed to a minor improvement in a standard practice for manufacturing biologic drugs generally—not any particular drug. Allowing biologic drug companies to

enjoin competition based on the infringement of such a patent, without any showing that the infringement was necessary to manufacture the biosimilar or even played a meaningful role in the manufacturing process, gives the biologic drug company a power to restrain competition that is completely out of proportion to the value of its patented invention.

In sum, if allowed to stand, the district court's decision would allow biologic drug companies to seize upon any infringement by an aspiring biosimilar competitor to extend the biologic company's monopoly by years, increasing the already exorbitant costs of biologic drugs, for which U.S. consumers already pay higher prices than consumers almost anywhere else in the world. *See, e.g.*, Rachel Goode & Bernard Chao, *Biological Patent Thickets and Delayed Access to Biosimilars, an American Problem*, J.L. & Biosciences, July-Dec. 2022, at 1, 3-4, 14-16.[2] This is precisely the type of leveraging of patents for improper competitive gain that the nexus requirement is supposed to prevent. *Apple II*, 695 F.3d at 1375. This Court should reverse.

## ARGUMENT

The district court's nexus analysis consisted of, in effect, three conclusions: (1) the biosimilar company (Accord) uses the patented invention as part of its FDA-approved process to obtain interchangeability with the biologic product, (2)

[2] https://academic.oup.com/jlb/article/9/2/lsac022/6680093

that interchangeability is what enables the biosimilar to effectively compete with the biologic, and (3) being forced to compete with a biosimilar will irreparably harm the biologic drug company (Janssen). Appx33-34. The court made no finding that Accord needed to use the patented invention to obtain interchangeability or that the patented invention gave Accord some advantage over non-infringing alternatives. According to the district court, if Accord's process for manufacturing an interchangeable biosimilar infringes, nexus is satisfied—no matter how trivial or nonessential the infringement may be. That is wrong and dangerously so.

## I. The District Court's Application of the Nexus Requirement Conflicts with this Court's Precedent.

This Court's precedent regarding both nexus and the related context of lost profits holds that a patentee cannot leverage a patent to avoid competition the patentee would have faced even without any infringement.

### A. The District Court's Nexus Analysis Is Irreconcilable with *Apple II.*

There is no way to reconcile the district court's application of the nexus requirement with this Court's decision in *Apple II*. In that case, the district court enjoined Samsung from selling its Galaxy Nexus smartphone based on the phone's infringement of Apple's patent covering a particular implementation of "unified search," which allows the smartphone to search more than one data storage

location through a single interface. 695 F.3d at 1372-73. In reversing that injunction, this Court held that, "where the accused product includes many features of which only one (or a small minority) infringe," it is not enough for the patentee to show that it will be irreparably harmed by competition with the accused product. *Id.* at 1374. The patentee must also show "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Id.* Where "sales would be lost even if the offending feature were absent from the accused product," the patentee cannot satisfy the nexus requirement because, "even if the competitive injury that results from selling the accused device is substantial, the harm that flows from the alleged infringement (the only harm that should count) is not." *Id.* at 1374-75 (quoting *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012)).

This Court emphasized the key equitable principle behind the nexus requirement: A patentee should not be able to "leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Id.* at 1375. Allowing the patentee to obtain an injunction based on "some insubstantial connection between the alleged harm and the infringement," even where the infringing feature does not "drive[] consumer demand for the accused product," would divorce the irreparable-harm inquiry from "a realistic sense of what the patentee has at stake." *Id.* Allowing patentees to avoid competition

because the aspiring competitor infringes a patent in some minor way, even when the competitor could have effectively competed *without* infringing, would provide the patentee with a windfall and undermine the careful "balance" the patent law strikes between "the need to encourage innovation and the avoidance of monopolies which stifle competition." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 146 (1989).

Applying these principles in *Apple II*, this Court held that Apple had not satisfied the nexus requirement. This Court explained that it was not enough for Apple to show that removing the infringing feature would "leave a particular feature, application, or device less valued or inoperable." *Apple II*, 695 F.3d at 1376. For instance, a laptop's battery or screws are essential in the sense that, if "those components [were] removed," the laptop would not work. *Id.* at 1376. But that does not mean that *any* infringement related to the battery or screws automatically satisfies the nexus requirement. Instead, the patentee must show that consumers buy the laptop because of the specific, claimed features of the battery and screws—and, correspondingly, that removing *that infringing feature* (not removing the battery or screws altogether) would impact consumer demand. *Id.* As this Court put it, Apple had to show "that consumers buy the Galaxy Nexus because it is equipped with the apparatus claimed in [Apple's] patent—not because it can search in general, and not even because it has unified search." *Id.*

The district court's analysis is impossible to reconcile with the holding or reasoning of *Apple II*. The district court concluded, in effect, that because the biosimilar used the patented invention in the manufacturing process to obtain interchangeability, and because interchangeability drives consumer demand, the biologic company satisfied the nexus requirement. Appx33-34. That is precisely the reasoning *Apple II* rejected—*i.e.*, that "unified search" was part of Samsung's search functionality and search functionality drives consumer demand. It is not enough to show that the patented invention relates, in some way, to a broader feature that drives consumer demand. The patentee must show that the use of the patented invention *itself* drives consumer demand. Here, for instance, the biologic company could show that the biosimilar could not have obtained interchangeability without using the patented invention or that consumers, for some reason, would not have wanted a biosimilar that obtained interchangeability without using the patented invention. But what is clearly not enough, under *Apple II*, is to show that the biosimilar happened to use the infringing method as a minor, nonessential step in obtaining interchangeability. Yet that is all the district court identified here.

This Court's decisions in *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858 (Fed. Cir. 2017), and *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, 127 F.4th 896 (Fed. Cir. 2025), demonstrate the type of showing that a patentee must make to meet the nexus requirement. In *Mylan*, for

instance, the district court found that, without infringing the asserted patents, the generic drug company "would not be able to make" the generic drug *at all*. 857 F.3d at 872 (citation omitted). Consistent with *Apple II*, this Court's decision relied on the district court's specific findings about the importance of the infringement; the Court disclaimed the argument that a court could "automatically find a causal nexus" whenever FDA's approval anticipates infringing conduct. *Id.* at 872-73. Similarly, in *Regeneron*, the district court had credited testimony about how it would be difficult to alter the infringing product to "achieve a non-infringing formulation." 127 F.4th at 918. And the patent in *Regeneron* claimed the formulation of the biologic product itself, not a minor step in its manufacture. *Id.* at 904. These are exactly the types of findings that are missing here. Indeed, Accord has identified undisputed record evidence that it could have achieved interchangeability without infringing. *See* Accord Br. 72-73. The district court never acknowledged this evidence or found that infringement was necessary to FDA approval or consumer demand for the biosimilar product. Hence, the court erred in holding that Janssen satisfied the nexus requirement and in issuing an injunction.

The district court relied on *Janssen Products, L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650 (D.N.J. 2014), Appx33-34, but that case also underscores what is missing here. There, the court found that the generic manufacturer "would not be

able to make the products proposed in its ANDA" without infringing, such that "it is not possible to separate the process for making the finished [drug] product from the product itself in evaluating consumer demand and nexus." *Lupin*, 109 F. Supp. 3d at 699-700. And the patent in *Lupin* was directed to a core moiety of the active ingredient itself. *Id.* at 655. Again, *Lupin* highlights what is missing here: The district court made no finding that Accord could not make its biosimilar without infringement, and the record shows that it could. *See* Accord Br. 72-73.

The district court's decision also conflicts with the core principle behind *Apple II*, which is to protect against patentees' abuse of the patent law to obtain "competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple II*, 695 F.3d at 1375. A patentee should not be able to use a competitor's minor, nonessential act of infringement to avoid competition that the patentee could have faced even absent that infringement. Enjoining competition in that context would provide the patentee with a windfall that is inconsistent with the "balance" between "the need to encourage innovation" and avoiding "monopolies which stifle competition." *Bonito Boats*, 489 U.S. at 146.

The district court's decision allows precisely such a windfall. Again, the court allowed Janssen to avoid biosimilar competition without *any* showing that Accord needed to practice the claimed invention to manufacture an interchangeable biosimilar product or that the patented invention (as opposed to

interchangeability more generally) plays a role in consumer demand for the biosimilar product. The result is exactly what *Apple II* warned against: Biologic drug companies can improperly "leverage" patents on nonessential steps in the biosimilar manufacturing process to keep biosimilar competitors off the market. 695 F.3d at 1375. That gives biologic drug companies a power to restrain competition that is wildly out of proportion to the value of the patented invention.

### B. This Court's Lost-Profits Precedent Confirms That a Reasonable Royalty, Not an Injunction, Is the Appropriate Remedy in a Case Like This.

This Court's lost-profits precedent reinforces the foregoing analysis. In its seminal decision in *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999), this Court held that, when constructing the "but for" market to calculate lost profits, the court must account for "alternative actions the infringer foreseeably would have undertaken had he not infringed." As this Court explained, "[w]ithout the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Id.* at 1351. Thus, where a patentee would have faced similar

competition even absent infringement, the patentee cannot recover lost profits but is limited to recovering a reasonable royalty.

The district court's decision in this case leads to the perverse result that a patentee who could *not* recover lost profits for past infringement because of the availability of non-infringing alternatives could nevertheless enjoin future infringement. That makes little sense. Lost profits and injunctions both serve to protect patentees from competition they never should have faced. Lost profits allow a patentee to recover damages for the profits it lost through such competition and injunctions protect patentees from such future competition. *Grain Processing* makes clear, however, that a patentee *cannot* recover profits the patentee lost through competition with an infringing product when the patentee could have faced the same competition even without the infringement. *Grain Processing* therefore bars the recovery of lost profits in a case like this one—*i.e.*, where a biosimilar company's manufacturing process infringes the biologic company's patent, but the biosimilar company could have used a non-infringing alternative to manufacture the same biosimilar product *without* that infringement.

That same reasoning should apply to the nexus requirement in the context of injunctive relief. Just as a patentee should not be able to recover lost profits from competition the patentee could have faced even without the infringement, the

patentee should not be able to enjoin competition it could have faced even without the infringement. In both contexts, the proper remedy is a reasonable royalty.

The only arguable difference between these two scenarios is that, in some circumstances, the accused infringer could avoid an injunction by promptly implementing the non-infringing alternative. But as both *Apple II* and this case show, that will not always be the case—not because there is no such alternative but because it can be hard to make rapid changes to complex products like smartphones or pharmaceuticals. Here, for instance, any change to Accord's manufacturing process would have to be approved by FDA, a process that can take years. Allowing Janssen to avoid competition in the meantime—based merely on a trivial and nonessential act of infringement that Accord could undisputedly have avoided—would give Janssen precisely the type of windfall that both *Apple II* and *Grain Processing* are intended to avoid. *See* Accord Br. 72-73.

This Court established the nexus requirement to ensure that patentees could not abuse the patent system to enjoin competition that the patentee could have faced even without infringement. The district court's decision permits precisely that type of abuse.

### C. The Facts Here Demonstrate Why the District Court Legally Erred in Applying the Nexus Requirement.

The facts of this case illustrate how far Accord's alleged infringement is from anything that drives Accord's ability to compete with Janssen. The asserted

claims of the ’168 patent recite a method of using a compound called putrescine to control levels of sugar chains called glycans that are attached to a protein. Specifically, the claims are directed to methods of culturing cells in a medium containing 0.1 to 10 mg/L of putrescine—a common cell culture nutrient disclosed in the prior art—to produce a protein whose glycan levels meet a target value at least 10% different from the level obtained without putrescine in that range. Appx65-66.

To the extent Accord infringes these claims, that infringement played only a minor and unnecessary role in its manufacturing process. As Accord explains, Accord’s manufacturer, Bio-Thera, selected one of its pre-existing cell culture media that happened to contain putrescine within the claimed range as a nutrient. The presence of putrescine in this cell culture medium was entirely incidental and had nothing to do with glycan control: Bio-Thera never tested putrescine’s effect on glycan levels or adjusted the concentration of putrescine. *See* Accord Br. 19-20, 22. In fact, even with the putrescine, Bio-Thera found that its glycan levels diverged from its target and Bio-Thera was therefore forced to close the gap by adjusting the levels of two other common nutrients, galactose and manganese—a technique published in the prior art. *Id.* at 21. The district court nevertheless found likely infringement because, in effect, if (1) putrescine had not been present in the cell culture medium, and (2) Accord had used the same amounts of galactose

and manganese to control glycan levels, then the relevant glycan level would have been at least 10% different from the level that would have been obtained had putrescine not happened to be in the cell culture medium. *See* Appx12-17.

Accepting that infringement theory as valid, it is about as trivial and nonessential as any patent infringement could be. Bio-Thera's actual method for controlling glycan levels relied on its non-infringing use of galactose and manganese—*not* putrescine. So if Bio-Thera had used a pre-existing cell culture medium that did *not* include putrescine—and hence had not infringed the patent—Bio-Thera simply would have used different amounts of galactose and manganese to obtain the target glycan level. *See* Accord Br. 72-73. In other words, even if the incidental presence of putrescine happened to play some role in changing glycan levels in Bio-Thera's process, that role could have been easily avoided simply by changing the amount of galactose and manganese. The putrescine had no impact on Accord's ability to develop a competing biosimilar. The fact that Janssen itself does not practice the asserted patent in manufacturing its biologic product further shows that practicing the asserted claims is not necessary. *See* Accord Br. 23, 73.

As discussed above, the district court only found nexus because the infringing use of putrescine played some role in changing glycan levels in Bio-Thera's process and changing glycan levels in turn supported interchangeability. Appx33-34. The district court made no finding that Accord could not achieve its

target glycan levels or make its biosimilar without infringement. Under *Apple II*, that is not nearly enough. Janssen had to show that the claimed use of putrescine—not just interchangeability or even glycan control in general—is what allows Accord to compete with Janssen. 695 F.3d at 1376. And, as just explained, the claimed use of putrescine is at most an incidental and unnecessary feature of a process whose glycan profile was achieved by other means—and could have been easily achieved without putrescine.

## II. The District Court's Decision Creates Grave Threats to Biosimilar Innovation and Affordability.

If allowed to stand, the district court's decision would inflict significant harms on the biosimilar industry. Not only would it increase the power of damaging "patent thickets" but it would encourage biologic companies to copy what Janssen did here: use generic manufacturing patents that are not specific to any particular biologic product to keep a biosimilar out of the market based on a minor, nonessential act of infringement. The district court's decision creates a playbook for suppressing biosimilar competition that will have stark consequences for the biosimilar market and the prices consumers pay for biologic drugs. And by endorsing that playbook, the court's decision will encourage biologic drug companies to further develop these thickets, either applying for or acquiring broad manufacturing patents solely to block competition.

Biologic drug companies' use of "patent thickets" to deter biosimilar competition is one of the primary reasons that U.S. consumers pay significantly more for biologic drugs than consumers in almost any other country in the world. Goode & Chao, *supra*, at 3-4, 14-16; *see also, e.g.*, Jeffrey Wu & Claire Wan-Chiung Cheng, *Into the Woods: A Biologic Patent Thicket Analysis*, 19 Chi.-Kent J. Intell. Prop. 93, 109-10 (2020).[3] After the patent on the biologic drug product itself expires, biologic drug companies tend to deploy these "thickets" of peripheral patents to try to block and delay biosimilar market entry. *See, e.g.*, *Johnson & Johnson v. Samsung Bioepis Co.*, 173 F.4th 454, 458 & n.1 (3d Cir. 2026).

The district court's decision, if allowed to stand, will give biologic drug companies a powerful new tool in asserting these thickets to avoid competition. Manufacturing biologic and biosimilar drugs is complex, and biologic drug companies have obtained hundreds if not thousands of patents covering various methods of manufacturing these products. At the same time, however, there are often multiple manufacturing methods available, and biosimilar companies can thus avoid infringement if they are aware of the relevant patents and understand their scope. But given the sheer quantity of potentially relevant patents, and the

---

[3] https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?article=1263&context=ckjip

lack of clarity in many of the relevant claims, it is easy for a biosimilar to unnecessarily include some minor act of infringement within its manufacturing process—an act of infringement that is then approved by FDA and baked into the biosimilar's FDA-approved manufacturing process.

Prior to the district court's decision in this case, biosimilar companies understood that, if they included such a minor and nonessential act of infringement within their manufacturing process, they could be subject to suit for reasonable royalty damages. But biosimilars did not believe that this type of infringement put them at risk of having their *entire product* kept off of the market via an injunction. For the reasons explained above, that understanding flows naturally from *Apple II*'s nexus requirement: Where the biosimilar company could have manufactured the same interchangeable biosimilar product without infringing the biologic company's patent, there is no reason the infringement should result in an injunction.

By holding that practically any infringement in the manufacturing process can support an injunction, the district court's decision greatly increases the risks biosimilar companies face from patent thickets. Minor, unnecessary acts of infringement included within the FDA-approved manufacturing process could keep the biosimilar out of the market for years, undermining the massive investments the biosimilar company made in developing the biosimilar product—a product that

does not itself infringe and could be manufactured without any infringement. The result will be fewer biosimilars and even greater costs to consumers and the already overburdened healthcare system that go far "beyond that which the inventive contribution and value of the patent warrant." *Apple II*, 695 F.3d at 1375.

These problems are magnified when, as in this case, the patent at issue is not directed to the manufacturing process for a specific biologic drug but instead is directed to a method for manufacturing biologic drugs generally. The claims Janssen asserted here are not specific to any particular biologic; they are, at best, a minor improvement in a basic process used in connection with manufacturing biologics. Janssen has, in fact, asserted this same patent against biosimilar versions of other biologic products. Accord Br. 23. Giving a biologic drug company the power to leverage this type of general manufacturing patent to enjoin biosimilar competition when the biosimilar did not need to infringe the patent creates a playbook for biologic drug companies to suppress biosimilar competition and extract exorbitantly high prices from consumers and the health-care system in ways that are completely disproportionate to the value of the patents at issue.

## CONCLUSION

This Court should reverse the district court's preliminary injunction.

Dated: November 13, 2026

Respectfully submitted,


/s/ David Zimmer

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rule 32(b)(1) because it contains 4,548 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2). This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point font for text and footnotes.

Dated: November 13, 2026 *<u>/s/ David Zimmer</u>*
David Zimmer

## CERTIFICATE OF SERVICE

I, David Zimmer, certify that, on this date, I electronically filed the foregoing document with the United States Court of Appeals for the Federal Circuit by using the court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

Dated: November 13, 2026 *<u>/s/ David Zimmer</u>*
David Zimmer